## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Sozo Illinois, Inc., f/k/a Sozo Health, Inc. | |
| Plaintiff, | |
| v. | Case No.  21-CV-3809 |
| Jay Robert Pritzker, Governor of the State of Illinois, in his official capacity; and | |
| Mario Treto, Jr., in his official capacity as Acting Secretary of the Illinois Department of Financial and Professional Regulation | |
| Defendants. | |

### <u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff Sozo Illinois, Inc. f/k/a Sozo Health, Inc., by and through its attorneys, Hansen Reynolds LLC, hereby submits this complaint seeking a declaratory judgment, temporary restraining order, and preliminary and permanent injunctive relief against Defendants Jay Robert Pritzker, in his official capacity as Governor of the State of Illinois, and Mario Treto, Jr., in his official capacity as Acting Secretary of the Illinois Department of Financial and Professional Regulation.  In support of the relief requested herein, Plaintiff hereby states as follows:

1

**Introduction**

1.      This case concerns  a fact pattern that is all too familiar in Illinois politics –
sound public policy intentions marred by backroom self-dealing between politically
connected and powerful factions that undermines the supposed benefits to the public and
violates the federal and state constitutional rights of non-insider participants in the
process (like Plaintiff Sozo).

2.      In June 2019, Governor Pritzker signed historic legislation – the Cannabis
Regulation and Tax Act (the "2019 Act") – which legalized recreational cannabis use in
Illinois.  The 2019 Act was signed with high hopes and much fanfare, with Pritzker
proclaiming that:  "This legalization of adult use cannabis brings an important and
overdue change to our state, and it's the right thing to do."  *See* "Legal marijuana is
coming to Illinois as Gov. Pritzker signs bill he calls an 'important and overdue change
to our state,'" Chicago Tribune, 6/25/19 (Exhibit A).

3.      The law contained "social equity" provisions aimed at addressing the
disproportionate negative impact of the drug war and the criminalization of cannabis use
on predominantly minority communities.  Among other things, the 2019 Act (and
subsequent guidance and regulations promulgated by the Illinois Department of
Financial and Professional Regulation – "IDFPR") created an application process for
adult use dispensary licenses that included an award of points to applicants who were
either majority-owned by individuals from certain disproportionately impacted
communities ("ownership method") or companies that committed to employ a certain
number of individuals from such communities ("employee method").  Under the 2019

Act and as confirmed by the IDFPR during the application process, applicants were to be treated the same regardless of whether they qualified for the social equity points via the ownership method or the employee method.

4.      On January 2, 2020, the IDFPR received over 4,000 applications for the first 75 adult use dispensary licenses (which were to be distributed in various regions across the state).  Plaintiff Sozo Illinois, Inc. ("Sozo") was one of the applicants, filing 11 total adult use dispensary applications in various regions utilizing the employee method for social equity status.  In reliance on the 2019 Act and IDFPR's guidance, Sozo hired, employed, offered benefits to, and trained employees from disproportionately impacted communities to qualify for social equity status under the employee method.  Sozo also worked with community organizations (particularly on the south side of Chicago) and an academic institution to provide prospective employment and educational opportunities to residents of these communities in the event that Sozo were awarded a license.  Sozo's financial investment in applying for Illinois adult use licenses, including its investment toward these social equity efforts, exceeds $350,000.

5.      The application process, however, was marred by delays and the results of the initial application scoring process fell far short of the lofty ideals proclaimed on the day Governor Pritzker signed the 2019 Act.  Specifically, after a delay of four months from the initial deadline of May 1, 2020, the IDFPR announced on September 3, 2020 that there was a tie of perfect scores in every region.  The "Tied Applicants" consisted of 21 companies that had submitted a total of 337 social equity applications that maximized scorecard values.

6. The IDFPR announced that it was going to conduct a lottery in late September 2020 wherein the initial 75 licenses would be awarded to the Tied Applicants. Because the Tied Applicants all had perfect scores (including points that were awarded for having Illinois residents as owners), this meant that the first 75 licenses would be awarded to only companies owned by Illinois residents and that applicants (like Sozo) without Illinois ownership would have no chance to receive those licenses.

7. Moreover, the 21 Tied Applicants were primarily owned by politically connected individuals and those with significant connections to the Illinois cannabis industry. These include, for example, separate groups owned by a former Superintendent of the Chicago Police Department, Illinois gaming operators, the leader of the Illinois cannabis trade association/lobbying group, a private equity fund, the owner of an iconic Gold Coast restaurant/brand, and at least one Democratic Committeeman and lobbyist.

8. The fact that the first 75 licenses would be distributed among 21 companies backed by political and industry insiders provoked outrage, protests, and litigation. In the face of this pressure, Governor Pritzker directed the IDFPR to halt the planned lottery.

9. Approximately ten months later, on July 15, 2021, Governor Pritzker signed a bill passed by the General Assembly that amended the Act ("the 2021 Act") and supposedly fixed the issues with the original process. In reality, however, the 2021 Act was nothing but a backroom deal between politically connected factions. (A copy of the 2021 Act – which shows the changes made from the 2019 Act – is attached as Exhibit B hereto.)

10.     Specifically, in exchange for maintaining the exclusive lottery for the first 75 licenses among the 21 Tied Applicants (despite its plainly unconstitutional Illinois residency preference), the 2021 Act reserves 55 of the next 110 licenses exclusively for companies that qualified as "Social Equity Applicants" under the ownership method, but not for any employee method applicants.  This effectively left many well-qualified applicants, like Sozo, with literally no chance at obtaining 130 of the first 185 licenses to be doled out.

11.     By changing the rules of process to give special priority to those Social Equity Applicants who qualified under the "ownership method," while specifically excluding those that qualified under the "employee method," the results of the application process are being used in a materially different manner than what was contemplated by the original act and the original IDFPR guidance on how applications would be evaluated.  This is fundamentally unfair and damages applicants like Sozo who relied on the original Act and IDFPR guidance in structuring their businesses and preparing their applications under the employee method.  There is no rational basis for drawing this distinction between Social Equity Applicants at this late hour given the benefits that companies – like Sozo – who qualified under the employee method will provide to impacted communities.  If not enjoined, this will result in licenses being awarded on criteria different than what was announced at the outset of the process through statute, and affirmed through Q&A procedures affirmed as a part of the state's structured application process, thereby depriving Sozo and other applicants of the right to due process and equal protection under the United States and Illinois Constitutions.

12. The General Assembly's "fix" reaffirmed - and in fact exacerbated - the Act's unconstitutional discrimination against companies, like Sozo, with out-of-state ownership in violation of the Commerce Clause of the United States Constitution. Indeed, applicants with ownership outside of Illinois have no chance at 130 of the first 185 licenses. Notably, rules similar to the Illinois residency preferences found in the 2021 Act have been found unconstitutional by the federal district courts. *See Toigo v. Dep't of Health and Senior Services, et al.*, No. 2:20-cv-04243 (W.D. Mo. June 21, 2021) (Exhibit C); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (Exhibit D); *NPG, LLC v. City of Portland, Maine*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. August 14, 2020) (Exhibit E). The implementation of the 2021 Act must be enjoined on this basis as well.

## The Parties

13. Plaintiff Sozo Illinois, Inc. f/k/a Sozo Health, Inc. ("Sozo") is an Illinois corporation. Sozo is wholly owned by Sozo Companies, Inc. Through other subsidiaries, Sozo Companies owns and operates extensive cannabis holdings in Michigan, from cultivation through retail in both the medical and adult use (recreational) markets there. Based in Warren, Michigan, Sozo Companies repurposed an abandoned metal stamping plant to develop a state-of-the-art cultivation and processing facility. Currently employing approximately 70 full-time people, upon completion of the final stage of buildout later this year Sozo Companies will likely employee more than 150 people. In addition to its grow and processing facility, Sozo Companies operates multiple retail locations in Michigan, with additional retail locations rolling out later this year. The

founder of Sozo Companies is Aaron Rasty. Mr. Rasty currently resides in Texas, but has spent much of the prior twenty-seven years as a resident of Illinois and has paid Illinois income and property taxes during that time. Mr. Rasty was also the co-founder of a successful energy company based in Chicago. Sozo's leadership team is further comprised of Illinois residents and other individuals with deep experience in the cannabis space, dating back to the earliest days of the industry in Colorado.

14. Defendant Jay Robert Pritzker is the Governor of the State of Illinois and is sued in his official capacity.

15. Defendant Mario Treto, Jr. is the Acting Secretary of the Illinois Department of Financial and Professional Regulation ("IDFPR").

## Jurisdiction and Venue

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff brings claims arising under the United States Constitution. Further, this Court has jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related claims arising under the Illinois Constitution.

17. Venue is proper pursuant to 28 U.S.C. § 1391 as the events giving rise to these claims occurred in this district, the Defendants reside in this district, and the Defendants maintain offices in this district through which they operate in their official capacities.

## Facts

## The Act

18. In 2019, the State of Illinois passed The Cannabis Regulation and Tax Act

(410 ILCS 705 *et seq.*) (the "2019 Act").

19. Under the 2019 Act, recreational cannabis use (also known as "adult-use") became legal in Illinois.

20. As an initial matter, organizations licensed to sell cannabis under earlier legislation were automatically given a license to sell cannabis or cannabis-infused product to recreational purchasers as of January 1, 2020. These licenses were referred to as "Early Approval Adult Use Dispensing Organization Licenses."

21. The 2019 Act further provided for additional licenses to be granted for the purposes of selling into the recreational market. These licenses are referred to as "Conditional Adult Use Dispensing Organization Licenses."

22. Under the 2019 Act, there are a total of 500 Adult Use Dispensing Organization Licenses available for issuance by the State. 400 ILCS 705/15-35(b).

23. The 2019 Act provided that up to 75 Conditional Adult Use Dispensing Organization Licenses would be issued before May 1, 2020. Further, the Act provided that up to another 110 Conditional Adult Use Dispensing Organization Licenses would be issued by December 21, 2020.

24. The strict limitation on the number of available Adult Use Dispensing Organization Licenses, together with proven demand and the immaturity of the cannabis industry, makes these licenses extremely valuable.

25. Recipients of similar licenses in other states have sold them, along with their dispensaries, for tens of millions of dollars. Further, even with limited retail capacity, the revenue generated from sales of adult use cannabis products in Illinois from January 1,

2020 through May 31, 2021 exceeds $1 billion.  Based on current trends, 2021 sales alone will likely exceed $1.2 billion.

26.     The 2019 Act set forth specific selection criteria for the Conditional Adult Use Dispensing Organization Licenses and provided for a point/scoring system associated with the selection criteria.

27.     The 2019 Act allowed for up to 250 total points "to complete applications based on the sufficiency of the applicant's responses to required information." 410 ILCS 705/15-30(c).

28.     The 2019 Act also provided for up to two bonus points (to be issued in the event of a tie between applicants) for a plan to engage with the community.

29.     Thus, applicants could obtain a total of 252 points.

30.     Under the 2019 Act, points were allocated in the following manner:

- Social Equity Applicant (50 points)
- Veteran (5 points)
- Illinois Resident (5 points)
- Suitability of Employee Training Plan (15 points)
- Security and Recordkeeping Plan (65 points)
- Business Plan, Financial, Operating Plan, and Floor Plan (65 points)
- Knowledge and Experience (30 points)
- Labor and Employment Plan (5 points)
- Environmental Plan (5 points)
- Diversity Plan (5 points)

31.     Under the 2019 Act, responsibility for issuing dispensary licenses was delegated to the IDFPR.

32.     The 2019 Act provided the IDFPR with discretion to adopt rules required for the administration of the 2019 Act and for the license and regulation of Dispensing Organizations.

33.     Thus, IDFPR had discretion to create and implement an application and grading process for Conditional Adult Use Dispensing Organization Licenses.

## The General Application Process

34.     In the fall of 2019, the IDFPR announced its application process to award the initial 75 Conditional Adult Use Dispensing Organization Licenses.

35.     The application submission deadline was noon on January 2, 2020.

36.     As part of this application process, entities needed to submit an application that consisted of hundreds of pages of documents. This meant not only completing multiple forms that the IDFPR provided, but submitting fingerprints, background information of owners, disclosing organizational charts, operating agreements, articles of organization, and all contracts and agreements (including oral) relating to the venture, as well as making financial disclosures and attesting to the financial viability of the applicant to proceed with the venture in the event it is awarded a license.

37.     Applicants also had to draft and submit robust plans that varied in page limit and point value.   The preparation of these complex materials was time-consuming, resource intensive, and onerous.   Applicants, like Sozo, were required to make a substantial investment of both employee time and financial resources.

38.     The IDFPR's dispensary license application did not exactly track the selection criteria in the 2019 Act. Rather, the application included that criteria within separate required "Exhibits" A through T:

- Exhibit A – Application Fee
- Exhibit B – Principal Officer Forms
- Exhibit C – Table of Organization, Ownership and Control & Operating Agreement
- Exhibit D – Dispensing Organization Agent Training and Education – 15 pages
- Exhibit E – Purchaser Education Plan – 10 pages
- Exhibit F – Business Plan – 30 pages
- Exhibit G – Recall, Quarantine, and Destruction Plan – 10 pages
- Exhibit H – Security Plan – 50 pages
- Exhibit I – Inventory Monitoring and Recordkeeping Plan – 15 pages
- Exhibit J – Floor Plan – 10 pages
- Exhibit K – Operating Plan – 40 pages
- Exhibit L – Plan for Community Engagement
- Exhibit M – Diversity Plan – 2,500 words
- Exhibit N – Knowledge and Experience of Principal Officers, 3 pages for each person
- Exhibit O – Financials
- Exhibit P – Status as Social Equity Applicant
- Exhibit Q – Labor and Employment Practices Plan – 10 pages
- Exhibit R – Environmental Plan – 5 pages
- Exhibit S – Status as Illinois Owners
- Exhibit T – Status as Veteran

39.     The IDFPR did not provide the complete point breakdown for each exhibit to applicants prior to the end of the application process.

40.     It was only after grading was completed that applicants found out the value of each exhibit and only after some applicants submitted requests for such information from the IDFPR via requests under the Freedom of Information Act.

41.     The IDFPR's ultimate scoring rubric was as follows:

- Exhibit D – Dispensing Organization Agent Training and Education –

15 points
- Exhibit E – Purchaser Education Plan – 4 points
- Exhibit F – Business Plan – 16 points
- Exhibit G – Recall, Quarantine, and Destruction Plan – 16 points
- Exhibit H – Security Plan – 48 points
- Exhibit I – Inventory Monitoring and Recordkeeping Plan – 17 points
- Exhibit J – Floor Plan – 22 points
- Exhibit K – Operating Plan – 6 points
- Exhibit L – Plan for Community Engagement – 2 point bonus in the event of a tie
- Exhibit M – Diversity Plan – 5 points
- Exhibit N – Knowledge and Experience of Principal Officers – 30 points
- Exhibit O – Financials – 1 point
- Exhibit P – Status as Social Equity Applicant – 50 points
- Exhibit Q – Labor and Employment Practices Plan – 5 points
- Exhibit R – Environmental Plan – 5 points
- Exhibit S – Status as Illinois Owners – 5 points
- Exhibit T – Status as Veteran – 5 points

42.     With regard to the Social Equity Applicant points, the 2019 Act provided that applicants could qualify as a Social Equity Applicant in one of several ways. Specifically, the 2019 Act stated: "Social Equity Applicant" means an applicant that is an Illinois resident that meets one of the following criteria: "(1) an applicant with at least 51% ownership and control by one or more individuals who have resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area[1]; (2) an applicant with at least 51% ownership and control by one or more individuals who: (i) have been arrested

---

[1] Both the 2019 and 2021 Acts define "Disproportionately Impacted Area" as follows: "a census tract or comparable geographic area that satisfies the following criteria as determined by the Department of Commerce and Economic Opportunity, that: (1) meets at least one of the following criteria: (A) the area has a poverty rate of at least 20% according to the latest federal decennial census; or (B) 75% or more of the children in the area participate in the federal free lunch program according to reported statistics from the State Board of Education; or (c) at least 20% of the households in the area receive assistance under the Supplemental Nutrition Assistance Program; or (D) the area has an average unemployment rate, as determined by the Illinois Department of Employment Security, that is more than 120% of the national unemployment average, as determined by the United States Department of Labor, for a period of at least 2 consecutive calendar years preceding the date of the application; and (2) has high rates of arrest, conviction and incarceration related to sale, possession, use, cultivation, manufacture, or transport of cannabis." *See* Ex. B at 52-53.

for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this Act; or (ii) is a member of an impacted family; (3) for applicants with a minimum of 10 full-time employees, an applicant with at least 51% of current employees who: (i) currently reside in a Disproportionately Impacted Area; or (ii) have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this Act or member of an impacted family." 410 ILCS 705/1-10 (as originally enacted); *see* Ex. B at 61-62. As noted earlier, the first two methods of social equity status are referred to as the "ownership method" of qualification whereas the third method is referred to as the "employee method" of qualification.

43. The awarding of points to Social Equity Applicants was meant to further the 2019 Act's purpose of helping to redress the negative impacts of the drug war and the criminalization of low-level cannabis offenses that disproportionately fell on minority communities.

44. During the application process, the IDFPR held two rounds of frequently asked questions (FAQs). Prospective applicants could submit written questions to which IDFPR would post answers. The IDFPR posted its answers to these questions on November 1, 2019 and November 25, 2019 respectively. Through these FAQs the IDFPR indicated that the Social Equity Applicant points would be awarded on a binary basis—all or none.

*45.* Specifically, in response to the question: "Are different methods of social equity qualification scored differently or do all social equity applicants receive the full 50 points?" – the IDFPR stated: "Applicants who demonstrate their status as a Social Equity

Applicant will receive the full 50 points and applicants that do not demonstrate status as a Social Equity Applicant will receive 0 points for Exhibit P." *See* Exhibit F at 13, Conditional Adult Use Dispensing Organization License Application QA Round 1. *At no time during the application process did the IDFPR indicate that Social Equity Applicants would be treated differently based on how they qualified for that status.*

46.     Thus, under the 2019 Act as originally enacted and as originally implemented by the IDFPR, applicants who qualified as "Social Equity Applicants" under either the owner or employee methods of qualification received all 50 available points and were otherwise treated equally under the law. No licenses were reserved or set-aside for applicants who achieved their "Social Equity Status" under the ownership method.

### Sozo Prepares and Submits Its Applications
### Pursuant to the Terms of the Act and IDFPR Guidance

47.     In structuring its Illinois business in 2019 and 2020 and in preparing its applications to obtain Conditional Adult Use Dispensing Organization Licenses, Sozo relied on the terms of the 2019 Act and the IDFPR's guidance.

48.     In particular, Sozo made significant commitments to developing a social equity team. To qualify as a Social Equity Applicant pursuant to the 2019 Act, Sozo hired eight employees who resided in a "Disproportionately Impacted Area," one employee that had been arrested for, convicted of, or adjudicated delinquent for an offense that is eligible for expungement under the law, and one employee who was a family member of an individual who, prior to June 25, 2019, was arrested for, convicted of, or adjudicated

delinquent for an offense made eligible for expungement under the law.

49. All of these employees started full-time work as of approximately January 1, 2020, and were paid a minimum of $16 per hour and offered company-subsidized health, dental and vision insurance as well as paid vacation. All employees received extensive training in the cannabis industry in order to best position themselves to succeed not only as employees, but as future entrepreneurs. This training included learning how to apply for cannabis licenses under the 2019 Act as well as an extensive business curriculum and in political advocacy.

50. In hiring, training, and employing these individuals, Sozo expended substantial resources including a monetary investment in excess of $300,000.

51. Notably, Sozo's commitment to these employees, social equity in the cannabis industry, and community engagement extended well beyond the mere hiring of numerous employees. Among other things:

    a. Sozo and the individual members of its leadership team have a track record of supporting cannabis social equity programs.

    b. Sozo was the first and only cannabis company at that time to partner with the Community Assistance Program (CAPs), a workforce development center that provides guidance, resources, and employment opportunities to individuals living on the south side of Chicago.

    c. CAPs seek partnerships with businesses, like Sozo, that can provide ongoing job opportunities and training resources to their clients.

    d. Eight (or 73%) of Sozo's employees were recruited through CAPs.

e. Sozo and CAPs worked together to offer targeted workforce development training materials for the cannabis industry as a new category of employment to be offered to CAPs clients.

f. Sozo's partnership with CAPs was intended to foster the employment and empowerment of communities and individuals who were directly impacted by the drug war.

g. Sozo has also partnered with the K.L.E.O. Community Life Center in Chicago as a staffing partner.

h. K.L.E.O. is a non-profit offering safety, training, education, and support for people of all ages and is committed to eradicating violence by bringing opportunities to those in need.

i. Sozo recruited three employees (27% of the Sozo workforce) from a K.L.E.O. group job fair hosted for the purpose of pairing candidates with the Sozo team.

j. Sozo also worked closely with Cannabis Equity Illinois.

k. Cannabis Equity Illinois is a grassroots organization that promotes equity and inclusion in the Illinois adult use market while ensuring a meaningful repair and reinvestment back into communities hardest hit by the drug war.

l. For example, Cannabis Equity Illinois offers expungement education sessions, pro bono legal aid, and "Know Your Rights" seminars to provide education about new cannabis laws.

m. Sozo worked with Cannabis Equity Illinois to sponsor a video with the

16

information found in the "Know Your Rights" seminars to increase the number of community members who are reached by the important information in those seminars.

n. Sozo has also partnered with the Last Prisoner Project, a nationally recognized non-profit that works to restore rights and advance the skills of individuals who were formerly incarcerated for cannabis convictions.

o. For example, Sozo provided financial contributions and supported Last Prisoner Project's "Roll It Up (for Justice)" program and clemency initiatives.

p. Sozo worked with Governor's State University in University Park, Illinois to identify opportunities to collaborate. Sozo and Governor's State University were hoping to provide greater access to cannabis entrepreneurship and support institutional opportunities for ongoing learning, education, supply chain management and entrepreneurship through the School of Extended Learning, and through participation in a speaker series that included such topics as vertical gardening.

52. In addition to these commitments, Sozo also relied on the 2019 Act in entering into leases and agreements to purchase real property for its prospective Illinois operations, spending thousands of dollars on rent and other expenses.

53. Ultimately, Sozo applied for eleven Conditional Adult Use Dispensing Organization Licenses on January 2, 2020. Specifically, Sozo filed eight applications in BLS Region #5 (Chicago-Naperville-Elgin), and one application in each of BLS Regions

#7 (Davenport-Moline-Rock Island), #11 (Rockford), and #12 (St. Louis).

54.     Sozo's 11 applications for Conditional Adult Use Dispensing Organization Licenses were made at a cost of $5,000 each, for a grand total of $55,000.

**The IDFPR Announces Lottery to Award 75 Initial Conditional
Adult Use Dispensing Organization Licenses Among "Tied Applications"**

55.     Sozo's applications were among over 4,000 total applications for Conditional Adult Use Dispensing Organization Licenses filed by the January 2, 2020 deadline by approximately 700 applicants.  Under the 2019 Act, the first 75 Conditional Adult Use Dispensing Organization Licenses were to be issued before May 1, 2020.

56.     KPMG was hired to grade and score the applications.

57.     On the eve of the May 1st deadline, the IDFPR and the Governor's office announced that grading of the applications was not timely completed due to the COVID-19 pandemic.

58.     There was no indication from the IDFPR or the Governor's office as to when the Conditional Adult Use Dispensing Organization Licenses would be issued.

59.     On September 3, 2020, the IDFPR notified applicants that there was a tie of perfect scores (252 points—250 plus the two bonus points) in every BLS region.  *See* Exhibit H (Announcement).

60.     Twenty-one (21) applicant groups (the "Tied Applicants") achieved a perfect score.

61.     The 21 Tied Applicants submitted a collective 337 applications and 8 of the 21 Tied Applicants account for 257 applications.

18

62. All of the Tied Applicants received the 5 points reserved for having an "Illinois owner" – meaning that the applicant was 51% or more owned or controlled by an individual who has been an Illinois resident for at least five years preceding the filing of the application. 410 ILCS 705/15-30(c)(8); *see* Ex. B at 103-04.

63. Similarly, all of the Tied Applicants received the 50 points awarded to "Social Equity Applicants." The 21 Tied Applicants included entities that qualified for Social Equity Applicant under each of the three methods specified under 410 ILCS 705/1-10 (as originally passed); *see* Ex. B. at 61-62. Upon information and belief, at least 7 of the Tied Applicants qualified for "Social Equity" status under the same "employee method" used by Sozo.

64. Based on their corporate registration information, at least some of the 21 Tied Applicants, and particularly those 8 Tied Applicants that account for 257 applications, are owned by politically connected individuals and those with significant connections to the Illinois cannabis industry.

65. These include, for example, separate groups owned by a former Superintendent of the Chicago Police Department, Illinois gaming operators, the leader of the Illinois cannabis trade association/lobbying group, a private equity fund, the owner of an iconic Gold Coast restaurant/brand, and at least one Democratic Committeeman and lobbyist.

66. The IDFPR initially planned to conduct a lottery in late September 2020 wherein the 75 initial Conditional Adult Use Licenses would be awarded to the Tied Applicants. Under the initial lottery plan, the Tied Applicants would get one entry into

the lottery for each application fee paid, with the maximum number of entries equaling the number licenses available in each BLS region.

67. Other than the Tied Applicants, many of which could win multiple licenses, no other applicant groups were to be allowed to participate in the lottery. Among other groups excluded, applicants (like Sozo) who did not receive the 5 "Illinois owner" points would not have been allowed to participate in the lottery.

68. Sozo scored 239 points on all but one of its eleven applications for the Conditional Adult Use Dispensing Organization Licenses. (There was an inexplicable scoring error on one of Sozo's application that led to a score lower than the 239 received by its other 10 applications.)

69. On each of its ten applications, Sozo did not get the 5 points allocated for Illinois-owned businesses, the 5 points allocated for veteran-owned businesses, and it scored 15 of 16 points for its Recall, Quarantine, and Destruction Plan.

70. Yet, despite obtaining approximately 95% of the available points, Sozo and other similarly well-qualified applicants would have been excluded from any opportunity to obtain one of the initial 75 Conditional Adult Use Dispensing Organization Licenses under the IDFPR's initial plan for a "Tied Applicant Lottery."

**In the Face of Protests and Lawsuits, the IDFPR Halts Its Initial Plans
For The "Tied Applicant Lottery" and a Legislative "Fix" Emerges.**

71. The news that the initial 75 Conditional Adult Use Dispensing Organization Licenses would be divided up among 21 firms consisting of political and industry insiders provoked outrage, protests, and litigation. *See, e.g.,* "Lawsuit seeks to delay weed

20

license lottery, alleges state picked 21 'politically-connected' insider companies," Chicago Tribune, 9/8/20 (Exhibit G); "Illinois Lawsuit Lashes Out at 'Politically Connected' Licensing Process," Cannabis Business Times, 9/11/20 (Exhibit I); "'Stop the Lottery:' Protesters Demand Changes to Illinois Cannabis Business License Process," bcchicago.com/local-2/stop-the-lottery-protesters-demand-changes-to-illinois-cannabis-business-license-process/2337826 (Exhibit J); "Illinois to 'Review Questions' Raised About Licensing Process Before Setting Date for Cannabis Dispensary License Lottery," Cannabis Business Times, 9/16/20 (Exhibit K); "The six lawsuits tying up Illinois cannabis licenses: It could take many more months," Grown In, 10/19/20 (Exhibit L); "Illinois lawmakers seek to add 75 new cannabis licenses in move to allow more minority ownership in lucrative pot industry," Chicago Tribune, 1/7/21 (Exhibit M).

72.     As a result of this negative reaction and the corresponding political pressure from unidentified "community leaders and stakeholders," on September 21, 2020, Governor Pritzker directed the IDFPR not to go forward with the awarding of initial 75 licenses. *See* 9/21/20 Press Release (Exhibit N.)

73.     The IDFPR never held the planned lottery for the initial 75 Conditional Adult Use Dispensing Organization Licenses, and, instead, looked to the Illinois General Assembly to "fix" the process and appease the various interest grounds that had raised issues with the licensing process.

74.     Ultimately, however, the General Assembly's "fix" retained the "Tied

Applicant" lottery for the group of 21 politically connected companies[2] who received perfect scores on their applications from the IDFPR. This lottery is now scheduled to take place on August 19, 2021.

75.     In exchange for preserving the privileged position of the Tied Applicants, the General Assembly materially changed the rules of the application process in a way that favored the well-connected special interest groups that had been the loudest in protesting the results of the original process while leaving other well-qualified applicants, like Sozo, with no chance at obtaining 130 of the first 185 licenses to be doled out. Indeed, the new law effectively changed the rules of the game at the start of the fourth quarter by giving special priority to those Social Equity Applicants who qualified solely under the "ownership method." In this way, the results of the application process are being used in a materially different manner than what was contemplated by the original act and the original IDFPR guidance on how applications would be evaluated. This would result in licenses being awarded on criteria different than what was announced at the outset of the process thereby depriving Sozo and other similarly situated applicants of the right to due process and equal protection under the United States and Illinois Constitution.

76.     Further, as explained in more detail below, the General Assembly's "fix" reaffirmed – and in fact exacerbated – the 2021 Act's unconstitutional discrimination against companies, like Sozo, with out-of-state ownership in violation of the Commerce

---

[2] The number of the "Tied Applicants" may increase based on the re-scoring of certain applications which is still on-going. It should be noted that additional applicants who qualified for social equity status under the employee method are not precluded from joining the Tied Applicant Lottery.

Clause of the United States Constitution.

77.     Specifically, the 2021 Act (which was passed by both houses of the General Assembly on May 28, 2021 and signed by Governor Pritzker on July 15, 2021) provided as follows:

a.   The Tied Applicant Lottery to apportion the first 75 licenses among the 21 politically connected companies who achieved perfect scores during the original application process would move forward (on July 29, 2021).[3]

b.   For purposes of the next 110 licenses, the General Assembly created a distinction among "Social Equity Applicants" that did not exist in the 2019 Act. *See* Ex. B at 108-28.

c.   Specifically, the General Assembly created two separate lotteries – each of which would award 55 licenses.  To qualify for either lottery, an applicant must have scored 85% of the available points on its original application and also be a "Social Equity Applicant."  *Id.*

d.   However, one of the lotteries was reserved for a new class of "Social Equity Applicants" created by the General Assembly for the first time in the 2021 Act: "Social Equity Justice Involved Applicants."[4]  This group was limited

---

[3] As noted earlier, additional companies may be added to the Tied Applicant lottery based on the re-scoring of applications that is currently on-going.

[4] The 2021 Act labels those who qualified under the "ownership method" as "Social Equity *Justice Involved* Applicants."  However, there is nothing about the mere identify of the owners of a business that necessarily equates to a greater commitment to social justice and equity.  In fact, it is only those companies, like Sozo, that qualified under the "employee method" who are *required* by the Act to demonstrate their commitment to the less affluent and less politically connected residents of impacted areas through employment, training, and education in the cannabis industry.

to applicants who qualified as a Social Equity Applicant under the so-called "ownership method" (e.g., at least 51% owned by an individual who came from a certain geographic region within the state of the Illinois, or an individual had been convicted of certain drug offenses under Illinois law that were now eligible for expungement, or an individual who is an immediate family member of someone from the designated geographic regions or who had been convicted of one of the offenses now eligible for expungement). Companies who had qualified as "Social Equity Applicants" by means of the "employee method," however, were excluded from participation in this lottery. The special lottery for the so-called "Social Equity Justice Involved Applicants" is scheduled for August 5, 2021, whereas the lottery for the remaining 55 licenses is scheduled for July 29, 2021. *See* Ex. B at 28-29, 119-28.

e. Notably, the 2021 Act did not apply this new distinction to the "Tied Applicant Lottery" – meaning that those companies that qualify for that lottery by securing "Social Equity Applicant" status via the employee method will keep their privileged position whereas other companies, like Sozo, who also qualified through the employee method but are not part of the Tied Applicant group were penalized.

78. The General Assembly made this change without any regard for companies, like Sozo, who had relied on the original rules in structuring their businesses and completing their applications via the employee method.

24

79.     Like changing the rules of the game at the start of the fourth quarter, the General Assembly's "fix" is fundamentally unfair and, as such, violated Sozo's rights to due process and equal protection under the 14th Amendment to the U.S. Constitution as well as the parallel provision in the Illinois Constitution.

80.     Further, the General Assembly's "fix" doubled down on the Act's unconstitutional discrimination against out-of-state residents. Specifically, under the 2021 Act, not only are the first 75 licenses reserved for companies with in-state ownership, but so are the 55 licenses to be awarded via the new "Social Equity Justice Involved Applicant" Lottery. This is because the criteria to qualify as a "Social Equity Justice Involved Applicant" effectively requires majority ownership by Illinois residents by requiring that the owners come from certain designated areas within Illinois or have been convicted of cannabis offenses in Illinois. As several federal district courts have already found in evaluating similar provisions in state cannabis licensing laws, such blatant and unjustified favoritism of local and parochial economic interests violates the Commerce Clause of the U.S. Constitution. *See Toigo v. Dep't of Health and Senior Services, et al.*, No. 2:20-cv-04243 (W.D. Mo. June 21, 2021) (Exhibit C); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (Exhibit D); *NPG, LLC v. City of Portland, Maine*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. August 14, 2020) (Exhibit E).

## Count I

### 42 U.S.C. § 1983 – Commerce Clause

81.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

25

82. The U.S. Constitution prohibits state laws that discriminate against citizens of other states. "[D]iscrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the later. If a restriction on commerce is discriminatory, it is virtually per se invalid." *Oregon Waste Sys., Inc. v. Dep't. of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994); *see also, e.g., Fulton Corp. v. Faulkner*, 526 U.S. 325, 331 (1996); *Tennessee Wine & Spirits Retailers Ass'n* v. *Thomas,* 139 S.Ct. 2449, 2461 (2019) ([I]f a state law discriminates against out-of-state goods or nonresident actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.")

83. A state law that discriminates against interstate commerce on its face "invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979); *see also Camps Newfoundland/Owatonna, Inc. v. Town of Harrison*, Me., 520 U.S. 564, 581 (1997) (explaining that strict scrutiny of a law that facially discriminates against non-residents "is an extremely difficult burden, so heavy that facial discrimination by itself may be a fatal defect" (quotation marks omitted)).

84. The 2021 Act discriminates against non-Illinois residents and entities owned by non-Illinois residents both on its face and by virtue of its effect. By virtue of the discriminatory provisions of the 2021 Act, namely the five points awarded to companies owned by Illinois residents and the preference given to "Social Equity Justice Involved Applicants", entities owned by non-Illinois residents are foreclosed from the opportunity to obtain 130 of the first 185 Conditional Adult Use Dispensing Organization

26

Licenses.

85.     Sozo is harmed by the 2021 Act's unconstitutional preference for entities owned by Illinois residents because the law both explicitly and implicitly targets entities, like Sozo, with out-of-state ownership and limits their economic opportunities in Illinois' booming cannabis industry.

86.     Illinois' residency preference does not have a legitimate local purpose.  Its purpose – either by design or effect – is to benefit Illinois residents over non-residents.

87.     Injunctive and declaratory relief are needed to resolve this dispute between Defendants and Sozo because Illinois' residency preference violates the United States Constitution and subjects Sozo to serious, concrete, and irreparable injuries for which it lacks an adequate remedy at law.

88.     Because this is an action to enforce Sozo's constitutional rights brought pursuant to 42 U.S.C. § 1983, Sozo should receive its reasonable attorney's fees incurred in prosecuting this action.  *See* 42 U.S.C. § 1988.

## Count II

42 U.S.C. § 1983 – Due Process

89.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

90.     The 14th Amendment to the United States Constitution provides, in pertinent part:  "No State shall make or enforce any law which shall abridge the properties or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

27

91.     By enforcement of the 2021 Act (as amended), Defendants would deprive Sozo of rights protected by the United States Constitution including, without limitation, the right to property protected by due process of law.

92.     As discussed in detail earlier in the Complaint, Sozo invested in its business and elected to apply for a Conditional Adult Use Dispensing Organization License in reliance on the terms of the 2019 Act and the related guidance from the IDFPR. By virtue of this, Sozo had a property interest in its application being considered in accordance with the terms of the 2019 Act. Specifically, as discussed in more detail above, Sozo invested over $300,000 in the hiring and training of employees from "Disproportionately Impacted Areas," engaged in community outreach efforts, and took other steps to prepare to do business in Illinois. In taking these actions, Sozo relied on the fact that it could qualify as a "Social Equity Applicant" and that all qualified "Social Equity Applicants" would be treated equally in the application process.

93.     The General Assembly, however, changed the rules of the game in the fourth quarter by giving preference to Social Equity Applicants who qualified under the "ownership method" over those like Sozo, who qualified under the "employee method" despite this distinction not being applied to the first tranche of 75 licenses. Specifically, in the 2021 Act, the General Assembly reserved 55 of the available licenses only for those applicants who qualified under the "ownership method" – renaming those applicants "Social Equity Justice Involved Applicants."

94.     There is no legitimate or rational basis for drawing this distinction and giving preference to applicants who qualified for social equity status under the

ownership method as there is no reason why entities who qualify under the "ownership method" will do more to serve the area communities adversely impacted by the drug war and prior criminalization of cannabis than companies who qualify under the employee method. This point is demonstrated by Sozo's track record of community engagement, which was discussed in detail in ¶¶ 47-54 above. Indeed, what Sozo did in hiring and training members of impacted communities provides real, tangible benefits to those communities that flow to the ordinary working people who live there, not just the more affluent and politically connected members of those communities. By contrast, the qualification criteria for the so-called Social Justice Equity Involved Lottery (e.g.., the "ownership method") relies solely on the identity of the ownership group and merely assumes that some benefit will trickle down to the community as a whole without actually requiring any specific actions that advance the purported social equity focus of the Act. Put simply, there is no rational basis for the amended Act's new distinction between Social Justice Applicants that can justify the fundamental unfairness of changing the rules of the application process *after* the applications have been submitted but *before* the license are awarded.

95.     Indeed, the 2021 Act (and the process that led to its adoption) has all the hallmarks of the type of backroom deal among political insiders that is all too typical of Illinois politics. Specifically, the 2021 Act preserves the privileged position of the 21 politically connected companies in the "Tied Applicant Lottery" for the initial 75 licenses *– regardless of how these applicants qualified as Social Equity Applicants –* in exchange for creating a preference in the distribution of the next round of licenses in favor the more

affluent and politically connected members of the impacted communities, all the while discounting the real benefits that Sozo and other companies would provide to ordinary members of those communities through employment, training and education.

96.     Injunctive and declaratory relief are needed to resolve this dispute between Defendants and Sozo because the 2021 Act violates the United States Constitution and subjects Sozo to serious, concrete, and irreparable injuries for which it lacks an adequate remedy at law.

97.     Because this is an action to enforce Sozo's constitutional rights brought pursuant to 42 U.S.C. § 1983, Sozo should receive its reasonable attorney's fees incurred in prosecuting this action.  *See* 42 U.S.C. § 1988.

## Count III

42 U.S.C. § 1983 – Equal Protection

98.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

99.     The 14th Amendment to the United States Constitution provides, in pertinent part:  "No State shall make or enforce any law which shall abridge the properties or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

100.     As described in the preceding paragraphs, by enforcement of the 2021 Act, Defendants would deprive Sozo of rights protected by the United States Constitution including, without limitation, the right to equal protection of the laws.

101.     Injunctive and declaratory relief are needed to resolve this dispute between

Defendants and Sozo because the 2021 Act violates the United States Constitution and subjects Sozo to serious, concrete, and irreparable injuries for which it lacks an adequate remedy at law.

102.    Because this is an action to enforce Sozo's constitutional rights brought pursuant to 42 U.S.C. § 1983, Sozo should receive its reasonable attorney's fees incurred in prosecuting this action.  See 42 U.S.C. § 1988.

### Count IV

Illinois Constitution

103.    Plaintiff realleges the preceding paragraphs as if fully set forth herein.

104.    Article 1, Section 2 of the Constitution of the State of Illinois provides that: "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

105.    As described in the preceding paragraphs, by enforcement of the 2021 Act, Defendants would deprive Sozo of rights protected by the Illinois Constitution including, without limitation, the rights to due process and equal protection of the laws.

106.    Injunctive and declaratory relief are needed to resolve this dispute between Defendants and Sozo because the 2021 Act violates the Illinois Constitution and subjects Sozo to serious, concrete, and irreparable injuries for which it lacks an adequate remedy at law.

**WHEREFORE** Plaintiff respectfully requests that the Court grant it the following relief:

(a) a declaration that the 2021 Act violates the Commerce Clause of the United

States Constitution by discriminating against companies with out-of-state ownership, like Sozo, without a legitimate local purpose;

(b) a declaration that the 2021 Act violates the rights of Sozo to due process and equal protection under the United States Constitution by materially changing the rules of the application process for Conditional Adult Use Dispensing Organization Licenses in the middle of the licensing process and after Sozo and others had relied on the 2019 Act and the IDFPR's guidance in structuring their businesses and submitting their original applications;

(c) a declaration that the 2021 Act violates that rights of Sozo to due process and equal protection under the Illinois Constitution by materially changing the rules of the application process for Conditional Adult Use Dispensing Organization Licenses in the middle of the licensing process in a manner that unfairly gave preference to one type of "Social Equity Applicant" over others (like Sozo) that had relied on the 2019 and the IDFPR's guidance in structuring their businesses and submitting their original applications;

(d) A temporary restraining order, preliminary and permanent injunctive relief enjoining Defendants from implementing the licensing process specified in the 2021 Act, including but not limited to moving forward with the lotteries set to occur on July 29, August 5 and August 19, 2021, due to the above-mentioned violations of the United States and Illinois Constitutions; and

(e) An award of attorneys' fees, costs and all other relief to which Plaintiff is entitled to under the law.

Dated this 16th day of July 2021.

**HANSEN REYNOLDS LLC**

/s/    Alan Nicgorski
Alan Nicgorski (State Bar No. 6243574)
Joseph Jacobi (State Bar No. 6273967)
Sarah Troupis Ferguson (pro hac vice pending)
150 S. Wacker Dr. 24th Floor
Chicago, IL 60606
Phone: 312.265.2253
Email: anicgorski@hansenreynolds.com
           jjacobi@hansenreynolds.com
           sferguson@hansenreynolds.com

*Attorneys for Plaintiff Sozo Illinois, Inc.*

## **Verification**

Pursuant to 28 U.S.C. § 1746, I, Aaron Rasty, the President of Sozo Illinois, Inc., hereby verify under penalty of perjury under the laws of the United States that, to the best of my knowledge and belief, the allegations of fact in the foregoing complaint are true and correct.

DocuSigned by:

*Aaron Rasty*

F5F10AE989DD4F8...

Aaron Rasty